# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **JUNIOR CLYDE NICKLES,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:10cv00014 |
| | ) | **REPORT AND RECOMMENDATION** |
| **LIBERTY LIFE ASSURANCE** | ) | |
| **COMPANY OF BOSTON, et al.,** | ) | |
| Defendants | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Junior Clyde Nickles, filed this action for declaratory judgment, challenging the final decision of Consolidation Coal Company, ("Consol"), terminating Nickles's long-term disability, ("LTD"), insurance benefits under a group disability benefit plan issued to the employees of Consol. (Exhibit A to Docket Item No. 1). Nickles also filed a Motion For Summary Judgment, arguing that he is entitled to LTD benefits for his lifetime as a matter of law. This cause of action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001 *et seq.* (West 2008 & Supp. 2010) ("ERISA"). Jurisdiction of this court exists pursuant to 29 U.S.C.A. §§ 1132(e) and (f) (West 2009). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

On August 6, 2010, the undersigned entered a Report and Recommendation,

recommending that the court open the administrative record and allow an evidentiary hearing for the submission of additional evidence from both sides. The court adopted the undersigned's recommendation, and an evidentiary hearing was held on October 18, 2010. For the reasons that follow, I recommend that the court deny both Nickles's Amended Motion For Declaratory Judgment, (Exhibit A to Docket Item No. 1, ("Declaratory Judgment Motion")), and his Motion For Summary Judgment, (Docket item No. 27), and enter judgment affirming the denial of benefits past age 70.

The disability benefit plan at issue in this case is the Consolidation Coal Company Long Term Disability Pay Plan, Group Policy No. GA-813117, ("the Consol Plan"), with an effective date of March 1, 1970. The Consol Plan specifically states that Consol is the Plan Administrator. (Docket Item No. 11, Administrative Record, ("A.R."), at 16, 74). Although not specified in the Consol Plan, it appears that Consol agreed to allow Liberty Life Assurance Company of Boston, ("Liberty"), to review claims brought against the Consol Plan as a claims administrator. (A.R. at 43, 153, 181.) However, the parties do not dispute that Consol retains the ultimate decisionmaking power as to benefit claims. Liberty was previously dismissed as a defendant in this action.

A de novo standard of review applies to ERISA challenges to an employee benefit plan administrator's benefits decision, absent a clear grant of discretion to the administrator to determine eligibility for benefits. *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 268-69 (4th Cir. 2002). Here, the Consol Plan does not expressly vest Consol with discretionary authority to determine eligibility for benefits. Therefore, this court must review de novo the decision to terminate Nickles's LTD benefits as of December 31, 2008. On de novo review of an ERISA benefits denial,

a district court must consider whether the participant is entitled to disability benefits as if it had not been decided previously. *See Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 988 (E.D. Va. 2005); *see also Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (holding that the de novo standard of review allows the court to examine all of the evidence in the record and decide whether or not the plaintiff in a case is totally disabled without giving any deference to the plan administrator's decision to deny or terminate disability benefits).

Nickles was approved to receive LTD benefits as of November 18, 1980. (A.R. at 224.) Thereafter, Nickles applied for, and was awarded Social Security disability income, ("SSDI"), benefits by Notice of Award letter dated June 7, 1982. (A.R. at 103-05.) By letter dated July 14, 2006, Liberty informed Nickles that his benefits would continue until age 70 based on medical information received at that time. (A.R. at 185.) By letter dated September 29, 2008, Nickles was informed that his LTD benefits would terminate as of December 31, 2008, because such benefits had been awarded under the terms of the Consol Plan due to a "sickness," for which benefits would terminate at age 70. (A.R. at 50.) Nickles appealed the termination of benefits on November 21, 2008, stating difficulty in obtaining medical records due to prior counsel's departure from practice, as well as the age of the medical records sought. (A.R. at 154.) By letter dated April 6, 2009, Consol, through its claims administrator, Liberty, upheld the termination of Nickles's LTD benefits. (A.R. at 43-45.) Nickles then filed this action seeking judicial review of Consol's termination decision.

As stated above, this case is before the court on Nickles's Declaratory Judgment Motion and on his Motion For Summary Judgment. Pursuant to the Scheduling Order, the parties are deemed to have moved for summary judgment in their favor based on

the administrative record. For the reasons that follow, I recommend denying both Nickles's Declaratory Judgment Motion, as well as his Motion For Summary Judgment. Testimony from the following individuals was received at the October 18, 2010, evidentiary hearing: (1) Nickles; (2) Linda Nickles, Nickles's wife; (3) Judy Umstott, Nickles's daughter; (4) Garnett S. Fuller, lead foreman at Virginia Pocahontas Mine No. 5 from 1979-1981; and (5) Nancy Johnson, Consol's Human Resources Coordinator. The court also received Joint Exhibit 1, (hereinafter referred to as "J.E."), which is the file from Nickles's workers' compensation claims related to the injuries at issue in this case. Following an earlier July 27, 2010, hearing, the court also allowed for the admission of a June 7, 2010, affidavit from Nickles; an August 30, 2006, affidavit from Fuller; and a September 7, 2006, letter from Dr. William A. McIlwain, M.D. (Attachment 1 to Docket Item No. 12).

## II. Facts

Nickles was born in 1938. (A.R. at 9.) He began working for Island Creek Coal Company, ("Island Creek"), on July 1, 1973.[1] At the evidentiary hearing, Nickles testified that he had worked in the coal mines in various capacities, including as a loading machine operator, a supply motor operator, a working hand in a preparation plant, a timberer, placing pins in the mine ceiling and as a foreman. At the time he worked for Island Creek, he was covered by the group LTD plan provided for Island Creek employees, ("Island Creek Plan"). (Exhibit 1 to Docket Item No. 35, Affidavit

---

[1]There is some discrepancy in the record as to when Nickles began working for Island Creek, with Nickles alleging a start date at some time in 1966. (Docket Item No. 12, ("Brief"), at 2.) Although such discrepancy makes no difference to the termination decision, the undersigned notes the discrepancy for clarity of the record.

of Philip Nicholson,[2] ("Nicholson Affidavit"), at 2.) On July 1, 1993, Island Creek was acquired by Consol. (Nicholson Affidavit at 1.) At that time, Nickles became a covered participant of the Consol Plan. (Nicholson Affidavit at 2.) Nickles testified that he was injured while working as a foreman at Virginia Pocahontas No. 2 Mine, ("VP #2"), on March 1, 1979. He testified that, at the time of the accident, he was attempting to move a motor from the belt head. He leaned against an improperly bolted banister, which gave way, causing him to fall onto his back on a belt drive below. Nickles testified that he "busted his stomach out," which required surgical repair. He stated that he did not injure his back as a result of this accident. He also testified that he did not undergo any chiropractic treatment for his back due to this injury. However, Nickles testified that he was required to undergo physical therapy before his physician would give him a "clean bill of health" and release him to return to work on a full-time basis. He stated that he underwent this physical therapy and was eventually released to return to work on a full-time basis.

Nickles testified that he was not receiving any treatment related to the VP #2 accident, and had completely recovered therefrom, when he suffered a second injury while working at Virginia Pocahontas No. 5 Mine, ("VP #5), on November 17, 1980. Nickles characterized this injury as "sudden onset" in nature. Specifically, Nickles testified that he noticed that a vibrating spring with a "busted cushion" needed to be changed. He stated that he took a flatbed car to get another spring. When he attempted to pull this spring off of a table, it was much heavier than he anticipated, and he injured his back. He stated that he felt a sensation like an electrical impulse in his

_____

[2]Philip Nicholson was, at all relevant times, a Human Resources Supervisor with Consol, and is currently the General Manager of Benefit Programs and Building Facilities with CONSOL Energy, Inc.

stomach and left leg, and he could not move. After other workers found him and took him to the office, Nickles testified that, at his direction, an accident report was completed, which he signed, and which was sent to the general mine foreman at his instruction. Nickles testified that he called his wife to pick him up, and she drove him to the Emergency Department at Bristol Memorial Hospital. He stated that he was hospitalized, initially undergoing physical therapy, but eventually undergoing back surgery. Nickles testified that he never returned to work. He adamantly testified that he had suffered no back injury prior to this time and that it was this injury at VP #5 that disabled him from working.

Nickles states in his Brief that, prior to this November 17, 1980, accident, he was "in good health, was approximately 40 years of age and often would work double shifts consisting of 16 hours at a time." (Brief at 2.) Although Nickles began receiving disability benefits under the Consol Plan in November 1981,[3] he contends that he did not know that he was awarded benefits due to a "sickness," as opposed to an "accident," until September 29, 2008, when Liberty informed him by letter of Consol's intention to terminate benefits paid for his disability due to "sickness" on his 70th birthday.[4] (Brief at 2; A.R. at 50.) As the defendants explain, however, there was no initial benefit determination stating that Nickles's disability was deemed due to a "sickness" because the initial benefit determination was made under the former Island Creek Plan, which did not make a distinction between disability due to "sickness"

_____

[3]Nickles did not begin receiving LTD benefits until November 1981. However, he was awarded benefits dating back to November 18, 1980.

[4]The letter stated that Nickles's disability benefits would actually terminate on December 31, 2008, the end of the year during which Nickles would turn 70 years old.

versus disability due to "accident." Instead, on June 12, 1981, Aetna Life Insurance Company, ("Aetna"), the administrator of the Island Creek Plan, sent Nickles a letter awarding LTD benefits until he reached the age of 65. However, at the time of the merger of the Island Creek Plan and the Consol Plan, Nickles's LTD benefits came to be governed by the terms of the Consol Plan. (Nicholson Affidavit at 2.) Notice of this merger was sent to all LTD benefit recipients under the Island Creek Plan. (Nicholson Affidavit at 2.)

On July 14, 2005, Liberty, the administrator of the Consol Plan, sent Nickles a letter explaining that an earlier May 26, 2005, letter, which stated that his benefits would terminate at age 65, was incorrect because a "different plan" applied to his claim. (A.R. at 51-52.) It appears that the basis of the May 26, 2005, letter was the Island Creek Plan, while the "different plan" referenced in the July 14, 2005, letter was the Consol Plan. On July 14, 2006, Liberty sent Nickles another letter explaining that his LTD benefits would "continue until age 70 based on medical information received at that time." (A.R. at 185.) On August 1, 2006, Nickles's counsel informed Liberty that Nickles was involved in a workers' compensation action "regarding an accident which occurred on or about March 1, 1979." (A.R. at 176-77.) On September 29, 2008, Liberty again advised Nickles that his benefit payments would cease at age 70 because such benefits were deemed due to a "sickness" under the terms of the Consol Plan. (A.R. at 50.) By letter dated October 10, 2008, Nickles's counsel advised Liberty that Nickles was injured due to an "accident," thereby entitling him to lifetime benefits. (A.R. at 164.) Liberty responded on October 30, 2008, stating that no documentation supported Nickles's claim for lifetime benefits and that Nickles's claim had been approved based on a diagnosis of osteoarthritis, which fell under the

"sickness" provision of the Consol Plan. (A.R. at 47-48.) Nickles further was informed of his right to seek a review of the determination to terminate his benefits. (A.R. at 47.)

On November 21, 2008, Nickles requested a review of the decision to terminate his benefits effective December 31, 2008. (A.R. at 154.) Thereafter, on January 27, 2009, Liberty again advised Nickles by letter that there was no documentation in the Administrative Record to support a finding that his disability was due to an "accident," and pursuant to the supplementation provisions of the Consol Plan, Liberty gave Nickles until February 2, 2009, to supplement the record with additional information to support his claim. (A.R. at 18, 150.) In response to this letter, Nickles provided Liberty with some additional information, as well as some information previously submitted to the Social Security Administration. However, on April 6, 2009, Liberty wrote Nickles, with Consol's approval, upholding the termination of LTD benefits effective December 31, 2008. (A.R. at 43-45.) Again, Liberty explained that the termination of Nickles's benefits was based on the classification of his disability as due to a "sickness" under the terms of the Consol Plan. (A.R. at 43-45.)

*III. Analysis*

In his Motion For Summary Judgment, Nickles argues that the terms of the Consol Plan required the defendants to notify him in writing of the denial, in whole or in part, of benefits. Nickles argues that the determination that his disability was caused by a "sickness" under the terms of the Consol Plan, thereby entitling him to benefits only until his 70th birthday, constituted a denial of benefits in part. Therefore, Nickles argues that by not advising him in writing that his claim was being denied in

part, he was, in fact, granted benefits for his lifetime and that such determination was made as a matter of law pursuant to the Consol Plan. I find it unnecessary to resolve the issue of whether Nickles's initial benefit determination constituted such a denial in part because it was the Island Creek Plan under which Nickles's initial benefit determination was rendered, and that plan did not contain any such notification requirement. In connection with their opposition to Nickles's Motion For Summary Judgment, the defendants have submitted evidence related to the acquisition of Island Creek by Consol and the resulting "merger"[5] of the two LTD plans. Consol acquired Island Creek on July 1, 1993. (Nicholson Affidavit at 1.) Prior to that time, Island Creek offered its employees an LTD plan, ("Island Creek Plan"), in which Nickles participated. Upon Consol's acquisition of Island Creek, the Island Creek Plan "merged" into the Consol Plan, and the receipt of benefits under the Island Creek Plan came to be governed by the provisions of the Consol Plan as of July 1, 1993. (Nicholson Affidavit at 2.) On July 15, 1993, Consol sent a letter to all recipients of LTD benefits under the Island Creek Plan explaining that the change in ownership affected their eligibility and coverage levels for LTD, which then would be determined in accordance with the Consol Plan. (Nicholson Affidavit at 2.) Additionally, follow-up letters explaining certain changes to benefit packages were sent to all recipients of LTD benefits under the Island Creek Plan on October 13, 1993, and October 27, 1994. (Nicholson Affidavit at 2.) In his affidavit, Nicholson testified that, as an LTD benefit recipient under the Island Creek Plan, Nickles would have been sent these letters from Consol. (Nicholson Affidavit at 2.) Nicholson further

---

[5]While the defendants refer to this acquisition resulting in a merger of the two plans, it appears that, for all practical purposes, the Island Creek Plan was terminated since, as of July 1, 1993, they concede that benefits granted under the Island Creek Plan became ineffective and were governed by the Consol Plan.

testified that following Consol's acquisition of Island Creek, the Island Creek Plan, under which Nickles received LTD benefits prior to July 1, 1993, became ineffective, and from July 1, 1993, the Consol Plan governed Nickles's LTD claim and benefits paid thereunder. (Nicholson Affidavit at 2.)

Given this "merger," the question arises as to whether Nickles's LTD benefits were vested at the time of the acquisition of Island Creek by Consol so that they could not be modified by the Consol Plan. For the reasons that follow, I find that Nickles's LTD benefits were not vested.

The Island Creek Plan was an employee welfare benefit plan as defined by ERISA. *See* 29 U.S.C.A. § 1002(1) (West 2008). As such, it was exempt from the statutory vesting requirements imposed by ERISA on employee pension plans. *See Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 637 (4th Cir. 1995); *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 855 (4th Cir. 1994). Generally speaking, "a plan participant's interest in welfare benefits is not automatically vested," so that an employer sponsoring the plan may unilaterally "terminat[e] or modify[] previously offered benefits that are not vested." *Gable*, 35 F.3d at 855; *see Wheeler*, 62 F.3d at 637. However, an employer may "waive[] its statutory right to modify or terminate benefits ... by voluntarily undertaking an obligation to provide vested, unalterable benefits." *Gable*, 35 F.3d at 855 (quoting *Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir. 1993)); *see Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993) ("the parties can agree to vest a welfare benefit plan.") However, "[b]ecause such an obligation constitutes an extra-ERISA commitment, ... courts may not lightly infer the existence of an agreement to vest employee welfare benefits."

*Gable*, 35 F.3d at 855 (citing *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1517 (8th Cir. 1988)); *Howe v. Varity Corp.*, 896 F.2d 1107, 1110 (8th Cir. 1990) (holding that courts may not infer an intent to vest from the "mere fact that employee welfare benefits continue in retirement"); *Wise*, 986 F.2d at 938 (holding that "silence" as to an employer's right to modify the plan does not "impliedly cede the right to later amend or discontinue coverage.") Instead, it is well-settled that because ERISA requires that employee benefit plans be governed by written plan documents, *see* 29 U.S.C. § 1102(a)(1) and 1024(a)(1), any participant's right to a fixed level of lifetime benefits must be "found in the plan documents and must be stated in clear and express language." *Gable*, 35 F.3d at 855 (quoting *Wise*, 986 F.2d at 937); *see Alday v. Container Corp. of Am.*, 906 F.2d 660, 665 (11th Cir. 1990). It is the plaintiff who bears the burden of proving that his employer's ERISA plan contains a promise to provide vested benefits. *See Gable*, 35 F.3d at 855 (citing *Howe*, 896 F.2d at 1109; *Anderson*, 836 F.2d at 1517, 1521). Because "ERISA plans are contractual documents[,]" *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir. 1996), determining whether a plan provides vested benefits is a matter of contract interpretation. That being the case, courts must enforce and follow "the plan's plain language in its ordinary sense." *Bynum v. Cigna Healthcare of N.C., Inc.*, 287 F.3d 305, 313 (4th Cir. 2002) (quoting *Wheeler*, 62 F.3d at 638). As a general rule, extrinsic evidence may not be relied upon where the documents are unambiguous on their face. *See Howe*, 896 F.2d at 1110 (citing *Anderson*, 836 F.2d at 1517).

Under the Island Creek Plan, "disability" for the first 24 months was defined as the inability to perform the type of occupation in which the participant normally engaged because of illness or injury. After the first 24 months, "disability" was

defined as the inability to perform any reasonable occupation because of illness or injury. (Exhibit A to Nicholson Affidavit, ("Island Creek Plan"), at LT-4.) In a section entitled "DURATION OF BENEFITS," the Island Creek Plan allowed for the receipt of LTD benefits as long as the participant remained totally disabled.  (Island Creek Plan at LT-6.)  That section further stated that benefits would not continue beyond the end of the month in which the participant either attained age 65 (if the disability period begins before age 60) or when the participant elected to retire, whichever occurred first. (Island Creek Plan at LT-6.) Finally, in a section entitled "PLAN CONTINUATION," there was a reservation of rights clause which stated that "Oxy[6] expects and intends to continue this plan but reserves the right to modify, suspend, change or terminate it at any time. Oxy does not guarantee the continuation of this LTD plan during any periods of active or inactive employment, nor does it guarantee any specific level of benefits."  (Island Creek Plan at LT-11.)

The Consol Plan specifies that benefits shall be paid for a disability due to "accident" for the claimant's lifetime, but only until age 70 if the disability is due to "sickness."  More specifically, the "Eligibility" portion of the Consol Plan contained in Section I states as follows:

> Benefit payments will continue until your 70th birthday if your disability is due to sickness . . . or for your lifetime if your disability is due to an accident. . . .

(A.R. at 21, 66.)  While the term "accident" is not defined in the Consol Plan, the

---

[6]Oxy refers to The Occidental Petroleum Corporation, the provider of the long-term disability benefits under the Island Creek Plan.

Consol Plan defines a total disability to be caused by "sickness," and, therefore, not by "accident," if such total disability:

> . . . is caused or contributed to by bodily or mental infirmity, disease or infection (except pus-forming infection which shall occur through an accidental cut or wound), or medical or surgical treatment therefor, even though the proximate and precipitating cause of the disability is accidental bodily injury, or . . . is caused directly or indirectly by an accident but commences more than Thirty days after the date of the accident. . . .

(A.R. at 30, 75.)

Generally speaking, a reservations of rights clause is inconsistent with, and in most cases will defeat, a claim of vested benefits. *See Jensen v. SIPCO, Inc.*, 38 F.3d 945, 950 (8th Cir. 1994) (citing *United Paperworkers Int'l Union v. Jefferson Smurfit Corp.*, 961 F.2d 1384, 1385 (8th Cir. 1992)). The court first must determine whether this clause itself is unambiguous so as to render unnecessary any review of other plan provisions and extrinsic evidence. I find that it is. Because the clause explicitly stated that Oxy was not guaranteeing the continuation of the LTD plan *during any period of active or inactive employment*, nor was it guaranteeing any specific level of benefits, I find that not only is there not a clear and express statement of an intent to vest benefits, but that there is a clear and express statement not to vest benefits in inactive employees, which, giving that term its common and ordinary meaning, would include employees already receiving LTD benefits on July 1, 1993, like Nickles. That being the case, I find it unnecessary to review any other Island Creek Plan provisions or any extrinsic evidence as it relates to any vesting issue.

All of this being said, I find that Nickles's LTD benefits did not vest under the

Island Creek Plan and, therefore, upon Consol's acquisition of Island Creek on July 1, 1993, Nickles's LTD benefits came to be governed by the Consol Plan. Interestingly, I note that, had Nickles's LTD benefits vested under the Island Creek Plan, they would have necessarily terminated under the terms of that plan when he reached age 65. However, because Nickles's LTD benefits were governed by the Consol Plan beginning July 1, 1993, a determination was thereafter made that his disability was due to a sickness under the terms of the Consol Plan, thereby entitling him to benefits through age 70. Thus, Nickles actually benefitted from the termination of the Island Creek Plan, in that he was granted five additional years of LTD benefits than he would have received under the Island Creek Plan.

In conclusion, I find that because Nickles's initial disability determination was made pursuant to the terms of the Island Creek Plan, which did not require that a distinction be made between disability due to "sickness" versus disability due to "accident," he is not entitled to summary judgment as a matter of law on this ground. Therefore, I recommend that the court deny Nickles's Motion For Summary Judgment.

I now will address whether, on de novo review, Nickles's disability was the result of a "sickness" or an "accident" under the terms of the Consol Plan. For the reasons that follow, I find that the evidence shows that such disability was the result of a "sickness," thereby entitling Nickles to LTD benefits only through his 70th birthday. As stated above, Nickles contends that a work-related accident resulting in a "sudden onset injury" on November 17, 1980, was the cause of his total disability. Consol, on the other hand, argues that all of the evidence before the court supports a

finding that Nickles's disability, which undisputably began on November 18, 1980, was actually the result of a March 1, 1979, accident and, therefore, commenced more than 30 days after the date of that accident. That being the case, Consol argues that Nickles's disability falls within the definition of "sickness" as used in the Consol Plan, thereby entitling him to LTD benefits only through his 70th birthday. For all of the reasons that follow, I agree.

Although Nickles contends that his total disability is due to a sudden onset back injury that occurred at VP #5 on November 17, 1980, there is no medical evidence in the record to support such contention. At the evidentiary hearing, Nickles testified that his wife picked him up from work that day and drove him to the Emergency Department at Bristol Memorial Hospital, where he was admitted and eventually underwent back surgery. There is no Emergency Department note contained in the record. The only medical records pertaining to this time period are an Admission History And Physical from Bristol Memorial Hospital, dated November 19, 1980, two days after Nickles's alleged sudden onset injury at VP #5, and the Discharge Summary associated with this hospitalization. Neither of these documents states that Nickles presented as the result of a work-related sudden onset back injury. However, I find that whether Nickles suffered a back injury on November 17, 1980, is irrelevant to the resolution of the issue before the court, as I find that the evidence shows that it was a March 1979 injury that eventually resulted in his total disability.

With regard to the medical evidence before the court, the aforementioned Admission History And Physical, signed by Dr. William A. McIlwain, M.D., states that Nickles's chief complaint was low back pain. (J.E. at 562.) In a section entitled

History Of Present Illness, Dr. McIlwain stated that Nickles had experienced low back pain *beginning approximately three months previously*, which was moderately responsive to conservative therapy. Dr. McIlwain further stated that Nickles had noted that he had experienced problems "*off and on for the last 3 years*, treated for one years['] time by a chiropractor and that while he was beginning to make progress he recently has slowed to an exacerbation." (J.E. at 562) (emphasis added). Dr. McIlwain stated that Nickles was being admitted for "conservative care and possible myelogram and surgery." (J.E. at 562.) The Discharge Summary shows that Nickles was released on December 4, 1980, having undergone a myelogram, which revealed a defect at the L-5/S-1 level of the spine, and a disckectomy with a left L-5/S-1 hemilaminectomy with excision of anomalous bone on November 28, 1980. (J.E. at 561.) In the section entitled History Of Present Illness, Dr. McIlwain noted that he had followed Nickles "as an outpatient with low back pain over a period of three years with follow-up by [Dr. McIlwain] for the last three months when he began with an acute exacerbation." (J.E. at 561.) The undersigned notes that, although Dr. McIlwain stated in the Discharge Summary that he, personally, followed Nickles as an outpatient for low back pain for the previous three years, he did not so state in the Admission History And Physical. Regardless of this inconsistency as to who treated Nickles's back pain, these two notes are consistent in that they state that Nickles had experienced low back pain for the previous three years and had experienced an exacerbation over the previous three months.

There are no medical records related to the March 1979 work injury contained in the record. In fact, the oldest medical evidence contained in the record are the Admission History And Physical and the Discharge Summary discussed above.

However, there is other evidence contained in the record that I find sufficiently shows that Nickles's total disability was the result of the March 1, 1979, injury and, therefore, falls within the definition of "sickness" pursuant to the Consol Plan.

In a letter dated September 7, 2006, Dr. McIlwain stated that Nickles was injured in a mining accident in 1979 and, "as a result of the 1979 accident, had to have surgery on his lumbar spine, done by me." (Attachment 1 to Docket Item No. 12). Dr. McIlwain further stated that "[t]he current visits that I have had with Mr. Nickles over the last few years in fact, have been, as I understand it, associated with his work-related accident of 1979." (Attachment 1 to Docket Item No. 12). In a treatment note dated May 9, 2006, Dr. McIlwain stated that Nickles "retrospectively . . . was first injured in 1979. . . . He had surgery ultimately in 1980 and is now working on getting his disability." (J.E. at 490.) Dr. McIlwain further stated that Nickles "has had multiple back surgeries during his time as a coal miner. He had his first back surgery in 1979 and in 1980 his second. Those are the dates that he remembers. I do not have those files any longer to state the actual date [but] that is, by my memory, very close to being correct." (J.E. at 490.) In another medical note dated June 22, 2006, Dr. McIlwain stated as follows: "Continued follow[-]up of very long-term back injury. This came as a result of working in the mines. . . . He was seen by me in 1980 for low back pain. He was seen by Dr. McFadden prior to that. The patient has had back problems since that time of injury." (J.E. at 492.) An August 24, 2006, treatment note indicates that Nickles saw Dr. McIlwain to "specifically discuss his disability from 1980. . . . He had low back surgery in 1980 and was disabled in 1981. . . . He said he had two separate back surgeries in 1980 and that two discs were removed at that time. I do not have those old records to make a comment on that." (J.E. at 495-96.) While

some of the dates referenced by Dr. McIlwain are somewhat inconsistent with other evidence of record, this appears to be due to the fact that he no longer had the prior medical records to which to refer, as they had been destroyed prior to Bristol Memorial Hospital closing and reopening in a different location as Bristol Regional Medical Center. In any event, these notes do show that Nickles suffered a work-related injury in 1979 that resulted in his eventual back surgery and disability.

In addition to this evidence, the testimony presented at the evidentiary hearing does not necessarily bolster Nickles's argument that his disability was the result of a November 17, 1980, injury. For instance, Garnett S. Fuller, a lead foreman who worked with Nickles from 1979-1981, testified that Nickles was injured on the job, but that he was not present at the time of the injury, learning of it a couple of days following the injury when he returned to work. He further testified that, at the time of the injury, Nickles had been working on a full-time basis, but that Nickles never returned to work thereafter. On cross-examination, Fuller testified, however, that the injury that he recalled could have occurred at any time between 1979 and 1981, as he did not remember the exact date of this injury. Linda Nickles, Nickles's wife, testified that Nickles suffered two work-related injuries that required medical treatment. She stated that the first was in 1979 at VP #2, resulting in surgery on Nickles's stomach. She stated that Nickles was released to return to work full-time, but that he suffered a second work-related injury at VP #5. Linda Nickles stated that she picked Nickles up from work following this injury and took him to the hospital, where he was admitted and eventually underwent back surgery. She further testified that she did not recall her husband having received chiropractic treatment for approximately one year prior to his hospitalization in November 1980. Linda Nickles testified that Nickles

never received a letter stating that he would receive benefits until age 65 and that he never had any knowledge that his benefits would expire. Judy Umstott, Nickles's daughter also testified at the evidentiary hearing. Umstott stated that she lived with her parents during the time that her father suffered two separate work-related injuries. She recalled that both instances required surgery, the first for an abdominal hernia around 1980. However, Umstott testified that she could not remember the exact date. She testified that her father was discharged home, and he returned to work full-time after this. Umstott further testified that the second injury occurred approximately one to two years after he returned to work from the first injury. She recalled that he was treated at Bristol Memorial Hospital, that he had surgery and that he never returned to work. Umstott testified that she did not recall any back injuries related to the first injury or prior to the second injury.

Despite all of this testimony, probably most telling is Nickles's own statements made in connection with his Social Security claim, his workers' compensation claims and those contained in his own affidavit, dated June 7, 2010, and submitted for this court's consideration. In his affidavit, Nickles described the course of his injuries as follows:

> In the latter part of 1978, I was working at a mine known as Virginia Pocahontas No. 2. . . . I was working there when I fell approximately twenty feet when a bannister did not hold. *I injured my back at that time*. I was taken to the old Grundy Hospital. . . . I was able to return to work *but continued to have problems and was put on physical therapy. I continued to take physical therapy until the second incident hereinafter described*. On or about November 17, 1980, I was working at V.P. No. 5. . . . At that time, I was lifting a machine used in the coal business when *I injured my back again, even though the first injury had never fully healed*. I was treated at a hospital in Bristol, Tennessee and my

treating physicians were Dr. McFadden and Dr. McIlwain.  I was never able to return to work after that date due to this accident that happened on the job.  At the time of the accident, I was in excellent health, was only 40 years of age and I was working as much as sixteen (16) hours a day, being double shifts. . . . *Before the fall in 1978 and the accident that occurred when I was lifting the machinery in 1980, I never had any back problems.*

(Attachment 1 to Docket Item No. 12, Affidavit of Junior Clyde Nickles, ("Nickles Affidavit")) (emphasis added).  Thus, despite Nickle's testimony at the evidentiary hearing, he clearly gave sworn testimony in his affidavit that his back problems began with the first injury at VP #2 and that this injury had not healed at the time of the alleged second injury in November 1980.  Additionally, in connection with his Social Security claim, Nickles submitted a handwritten statement that read as follows:

"[i]njured back in fall in 1978 but continued working to Sept 1980 when I was off work for 8 weeks for hernia operation related to above fall. Returned to work to 11/17/80 when I lost use of left leg *due to old back injury* + was hospitalized.  Not able to work since.

(A.R. at 135) (emphasis added).  This note does not even mention a second injury having occurred in November 1980 and, in fact, Nickles argued to the Social Security Administration that he left work on November 17, 1980, as the result of an old back injury, presumably that which occurred in March 1979.  Similarly, as recently as April 18, 2006, Nickles, again in his own handwriting, represented to Liberty in a Claimant Supplementary Statement that he was, at that time, involved in pending litigation "trying to col[l]ect pay for medical for acc[ident] 1979 was disabled from it." (A.R. at 187.)  Thus, again, Nickles claimed that he was disabled due to the 1979 accident, and he again did not mention any injury having occurred in November 1980.  Finally,

in his Amended Declaratory Judgment Motion, Nickles alleges that he fell off of a belt drive in March 1979, "causing injuries to his *back*, stomach and nerve damage in the left leg." (Amended Declaratory Judgment Motion at 2) (emphasis added). He further alleges that he suffered a second accident while working for Island Creek, "injuring and paralyzing his left leg." (Amended Declaratory Judgment Motion at 2.) Thus, Nickles again has stated that he suffered a back injury as a result of the 1979 accident.

Additionally, at the Workers' Compensation hearing, in September 2006, Nickles testified that as a result of the VP #2 accident he "crushed [his] spine up, [his] lower spine, and busted his stomach out. . . ." (J.E. at 53.) He further testified that he continued to work after this accident, "through physical therapy." (J.E. at 54.) Nickles testified that while still undergoing physical therapy, he injured his back while attempting to lift the heavy clean coal vibrator. (J.E. at 54-55.) When asked to describe the course of treatment for his back, Nickles testified that he initially had been sent to Grundy Hospital, but was sent from there to Drs. McFadden and McIlwain because "[f]rom Grundy Hospital if you have problems, they send you off, and I was sent to Bristol." (J.E. at 55.) He stated that Drs. McFadden and McIlwain initiated physical therapy. (J.E. at 55.) He stated that he was still undergoing "doctor's treatment," but his back kept getting worse until he was dragging his leg and could not even walk. (J.E. at 55.) Nickles testified that exploratory surgery was then performed, and a protruding disc was identified, which he was informed could be corrected with physical therapy. (J.E. at 55-56.) Thus, again, it appears that Nickles has previously provided testimony that he injured his back in the initial work-related fall and that it was not healed at the time of any alleged November 1980 injury.

Furthermore, in his Answers To Interrogatories And Request For Production Of Documents, dated August 29, 2006, provided in connection with his workers' compensation claim, in response to the question of whether he had experienced any pain, discomfort or symptoms in the part of the body allegedly injured in the November 17, 1980, accident at any time before that date, he stated that he injured his back in a fall at work "on or about March 1979." (J.E. at 139.) Nickles further stated that, following the March 1979 injury:

> I received chiropractic care from Dr. Willis, who is located in Richlands, Virginia. Thereafter, I was seen by a doctor who was located at the Grundy Hospital in Grundy, Virginia, whose name I cannot remember. This physician referred me to a Dr. Robb, who was located in Princeton, West Virginia. . . . Dr. Robb indicated to me that I had a large, protruding disc, which he said that I could live with.

(J.E. at 139-40.) Thus, it appears that by Nickles's own words, he suffered a rather severe back injury as a result of the March 1979 accident and, for which he was continuing to be treated as of November 17, 1980. On a workers' compensation Claim For Benefits form, dated February 9, 2006, signed by Nickles, he stated that his accident occurred in 1979. (Defendant's Exhibit 4). He further described the nature of the injury as "disc in back and bon[e]s m[e]ssed up." (Defendant's Exhibit 4.) He noted that he was seeking compensation for permanent disability as a result thereof. (Defendant's Exhibit 4.) In another workers' compensation Claim For Benefits form, dated April 18, 2006, Nickles again indicated an accident date of March 1, 1979, noting injury to "disc in back." (Defendant's Exhibit 3). He again noted that he was seeking compensation for permanent disability as a result of this accident. (Defendant's Exhibit 3).

The defendants have submitted an Employee Information Work Sheet, dated June 1, 1981, and signed by Vern C. Reynolds, a mine superintendent. (Defendant's Exhibit 1.) On this Work Sheet, it is stated that Nickles's "[j]ob performance in the last 2-3 years has been hampered by his physical condition. The last two years he seemed to be in great pain most of the time." (Defendant's Exhibit 1). I find that this statement undercuts Nickles's affidavit testimony that he was in excellent health up until November 17, 1980. The defendants also submitted a "Foreman's Report Of Injury," dated October 14, 1975, showing that Nickles suffered a back strain on October 10, 1975. (Defendant's Exhibit 6.) This report shows that Nickles returned to work on October 13, 1975. (Defendant's Exhibit 6.) Nickles testified that he did not recall such an injury.

As stated above, this court must decide, de novo, whether Nickles's disability is the result of an "accident," thereby entitling him to lifetime LTD benefits, or whether it is the result of a "sickness," thereby entitling him to LTD benefits only through his 70th birthday. Nickles has the burden of showing that his disability is due to an "accident," as opposed to a "sickness." In *Band v. Paul Revere Life Ins. Co.*, 14 Fed. App'x 210, 212 (4th Cir. July 20, 2001), an unpublished decision, the Fourth Circuit held that the burden is on an insurance beneficiary to prove his or her total disability benefits under an ERISA plan.[7] *See also Fuja v. Benefit Trust Life Ins. Co.*, 18 F.3d 1405, 1408 (7th Cir. 1994) (holding ERISA plaintiff has burden of proving coverage); *Gable*, 35 F.3d at 855-56 (holding ERISA plaintiffs bear the burden of proving their employer's ERISA plan contains a promise to provide vested benefits).

---

[7]*See* Fourth Circuit Court of Appeals Local Rule 36(c). *See also Collins v. Pond Creek Mining Co*., 468 F.3d 213, 219 (4th Cir. 2006) (unpublished decisions have no precedential value and are only entitled to the weight generated by the persuasiveness of their reasoning).

In determining whether Nickles met this burden, this court is governed by the principles of federal law. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56-57 (1987). The Fourth Circuit has held that "ERISA demands adherence to the clear language of [the] employee benefit plan." *White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir. 1997). In *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1009-10 (4th Cir. 1996), the Fourth Circuit held that the express terms of the plan must be followed.

As noted above, the express terms of the Consol Plan provide that a total disability is caused by "sickness" if such total disability:

> . . . is caused or contributed to by bodily or mental infirmity, disease or infection (except pus-forming infection which shall occur through an accidental cut or wound), or medical or surgical treatment therefor, even though the proximate and precipitating cause of the disability is accidental bodily injury, or . . . is caused directly or indirectly by an accident but commences more than Thirty days after the date of the accident. . . .

(A.R. at 30, 75.) For all of the reasons stated herein, I find that Nickles's disability was caused by a "sickness," as it was caused directly or indirectly by the March 1, 1979, accident, but did not commence until November 17, 1980, more than 30 days after the March 1, 1979, accident.

As an aside, I note that even if the defendants had made an incorrect determination under the Consol Plan that Nickles's disability was the result of an "accident," thereby entitling him to lifetime benefits, ERISA law is such that his benefits could, thereafter, upon review, be deemed to be the result of a "sickness" and,

therefore, expire upon his 70th birthday. Specifically, the Fourth Circuit has held that the common-law doctrine of equitable estoppel is not available to modify the written terms of an ERISA plan in the context of a participant's suit for benefits. *See Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 58-60 (4th Cir. 1992); *see also HealthSouth*, 101 F.3d at 1010. The Fourth Circuit has not held that claims of estoppel and waiver are never applicable in ERISA cases. In fact, the Fourth Circuit has specifically upheld a decision of this court applying equitable principles in crafting an appropriate remedy. *See Adams v. Brink's Co.*, 261 Fed. App'x 583 (4th Cir. Jan. 11, 2008) (affirming *Adams v. Brink's Co.*, 420 F. Supp. 2d 523 (W.D. Va. 2006)). Furthermore, this court has recognized that estoppel principles may be invoked in ERISA cases where the action at issue is an interpretation of an ambiguous plan provision. In any event, such principles of estoppel are not relevant to this court's decision in the case at bar.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1) The Island Creek Plan and the Consol Plan "merged" on July 1, 1993, at which time Nickles's receipt of LTD benefits came to be governed by the Consol Plan;

2) The Island Creek Plan, which governed at the time Nickles was first awarded LTD benefits, did not require that an initial determination be made as to whether a participant's disability was caused by an "accident" or a "sickness;"

3)      Thus, no such determination was made at the time Nickles was initially awarded LTD benefits;

4)      Therefore, Nickles is not entitled to summary judgment as a matter of law due to the defendants' failure to notify him that his disability was deemed due to a "sickness," for which his LTD benefits would terminate at age 70;

5)      Nickles's LTD benefits under the Island Creek Plan were not vested at the time of the acquisition of Island Creek by Consol;

6)      As of the date of acquisition, Nickles's LTD benefits began to be governed by the Consol Plan;

7)      The evidence before the court, on de novo review, sufficiently shows that Nickles's disability resulted from a March 1, 1979, accident, but that his disability did not commence until November 18, 1980, more than 30 days after March 1, 1979;

8)      Thus, Nickles's disability was due to a "sickness" under the terms of the Consol Plan; and

9)      Nickles is not entitled to a declaratory judgment that he is entitled to lifetime LTD benefits.

## RECOMMENDED DISPOSITION

For all of the foregoing reasons, I find that Nickles's disability was the result of a "sickness" as defined in the Consol Plan, and I recommend that the court deny Nickles's Amended Declaratory Judgment Motion. I further find that because the terms of the Island Creek Plan governed the initial grant of LTD benefits, the defendants were not required to inform Nickles that his disability was deemed due to a "sickness" or an "accident," as those terms were relevant only in the Consol Plan. Therefore, I recommend that the court deny Nickles's Motion For Summary Judgment

as well. I further recommend that judgment be entered affirming Consol's denial of benefits past the age of 70.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]. The judge may also receive further evidence or recommit the matter to the magistrate [judge] with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 29th day of November 2010.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE